**LOUIS DREYFUS CORPORATION,**
**Plaintiff-Appellee, Cross-Appellant,**

v.

**J.B. BROWN and Michael Smith, Defendants-Appellants, Cross-Appellees.**

No. 82–4161.

United States Court of Appeals,
Fifth Circuit.

June 29, 1983.

Jack Parsons, Eddy Parsons, Wiggins, Miss., for defendants-appellants, cross-appellees.

Gary L. Roberts, Pascagoula, Miss., for plaintiff-appellee, cross-appellant.

Before RUBIN, GARZA and WILLIAMS, Circuit Judges.

PER CURIAM:

In January of 1980 and July of 1980, J.B. Brown and Michael Smith, the defendants, executed two contracts for the delivery of soybeans to Louis Dreyfus Corporation, the plaintiff. The first contract called for the delivery of 20,000 bushels of soybeans at $7.15 per bushel, while the second contract called for the delivery of 10,000 bushels of soybeans at $7.54 per bushel. After executing the contracts with the defendants, the plaintiff contracted to resell the soybeans to third parties. Growing conditions were poor during the 1980 season. A drought during the summer was followed by heavy rainfall which damaged a large portion of the soybean crop. The plaintiff was aware of the farmers' difficulties and on November 26, 1980, its grain merchant, Ron Cox, sent a letter to the defendants extending the delivery time until December 12, 1980.

On December 8, defendant Smith called Cox. The center of controversy in this case is the content and effect of this conversation. Cox testified at trial that Smith informed him that the defendants had harvested all of the soybeans and that they were ready to "pay up." At that time none of the parties knew the exact amount of the underfill on the contracts because a number of bushels owned by the defendants were being cleaned in order to meet the contracts' quality standards. It was known, however, that the defendants were over twenty thousand bushels short on their contract.

Cox alleged that he went on to say, "Well, Mike, you know what I've got to do," to which the defendant responded, "Yes, I know." *Id.* at 30. Cox explained that he immediately purchased 20,000 bushels of soybeans on the Chicago Board of Trade after he finished speaking with Smith in order to make certain that the plaintiff would be able to deliver beans to its customers. The defendants claimed that Smith merely informed Cox that they had completed their harvesting and that they would "settle up" with the plaintiff on the date of delivery. On cross-examination, however, when defendant Smith was confronted with an earlier statement made during his deposition in which he testified that he had said that the defendants would "pay-up," Smith replied, "Well, I must have did [sic] if that's what I said." In light of Smith's adoption of his earlier statement, there was no factual dispute concerning what was said on December 8th.[1]

The plaintiff brought this diversity action against the defendants to recover the losses it sustained by having to buy soybeans in December to cover the shortage on the contracts, an amount totaling $21,656.00. The defendants denied liability on the basis of two affirmative defenses: (1) that poor weather conditions made performance impossible[2] and (2) that the plaintiff had refused to accept delivery of the soybeans. They also counterclaimed, alleging that the plaintiff owed them $6,812.00 for the beans that it had refused, that amount representing the difference between the market price at the time of delivery and the contract price.

At trial, the district court granted a directed verdict in favor of the plaintiff on the defendants' counterclaim, and a judgment notwithstanding the verdict, also for the plaintiff, after the jury found in the

---

1. Even if we accept defendants' contention that Smith told Cox they would "settle up," the gist of the conversation is the same. Looking at the facts leading up to the conversation and the context in which defendants claim the phrase "settle up" was used, the only reasonable interpretation of the dialogue is that, due to their failure to meet their obligations under the contract, the defendants were prepared to financially settle with the plaintiff.

2. The defendants subsequently conceded that poor weather conditions would not have excused their performance of the contract. *See Ralston Purina Co. v. Rooker,* 346 So.2d 901 (Miss.1977).

defendants' favor. The defendants appealed both actions, as well as the trial judge's failure to give a requested jury instruction. The plaintiff cross-appealed on the grounds that the district court's alleged abuse of discretion concerning two evidentiary rulings entitled it to a conditional new trial.

We shall first look at the propriety of the district court's granting of a judgment notwithstanding the verdict. A jury verdict should not be disturbed unless, after viewing "all of the evidence—not just that evidence which supports the non-mover's case—... in the light and with all reasonable inferences most favorable to the party opposed to the motion," the court is able to conclude that "reasonable men could not arrive at a contrary verdict."[3] *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc). *See Dalton v. Toyota Motor Sales, Inc.,* 703 F.2d 137, 140 (5th Cir.1983). After reviewing the record, we conclude that this is such a case.

All parties concede that the central issue is whether the December 8 phone conversation constituted an anticipatory repudiation of the contracts under Miss.Code Ann. § 75–2–610 (1972).[4] The Mississippi Code does not define anticipatory repudiation, but the official comments accompanying the Uniform Commercial Code explain that

[a]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.

U.C.C. § 2–610 comment 1, (1962). Similarly, pre code Mississippi law required an anticipatory repudiation to be "positive and unconditional." *Old Ladies Home Ass'n v. Hall,* 212 Miss. 67, 52 So.2d 650, 655 (1951).

The plaintiff concedes that the question, whether an anticipatory repudiation has occurred, is normally a factual issue to be determined by the jury, but it maintains that the defendants in this case provided a clear indication that they had no intention of performing the contracts. We agree with the plaintiff and the district court and conclude that, under Mississippi law, Smith's statement constituted an anticipatory repudiation. *See Wander Ltd. v. Krouse,* 368 So.2d 235 (Miss.1979). The context of this statement makes this the only reasonable interpretation. A contrary result would penalize the plaintiff for covering on December 8, and under the circumstances, this would be unjustifiable.

Since the standard governing review of directed verdicts and judgments n.o.v. is the same, *Boeing Co. v. Shipman, supra,* we also affirm the district court's decision to grant a directed verdict in favor of the plaintiff on the defendants' counterclaim. Once the seller had repudiated the contract, the buyer was authorized to refuse delivery of the portion of the soybeans as to which the seller had repudiated the contract. Miss.Code Ann. § 75–2–711(1) (1972).

Finally, the defendants argue that the plaintiff did not prove it was damaged by the transaction. We disagree. After an anticipatory repudiation has occurred, an aggrieved buyer may recover damages arising out of the cost of "covering" his purchase under Miss.Code Ann. § 75–2–712 (1972), or damages measured by the difference "between the market price at the time when the buyer learned of the breach and

---

**3.** Both the district court and the defendants have relied on Mississippi law in discussing the standard of review of a judgment n.o.v. *See General Tire & Rubber Co. v. Darnell,* 221 So.2d 104 (Miss.1969). The federal, rather than the state test, applies in diversity cases. *Boeing Co. v. Shipman, supra,* at 368–370.

**4.** The Mississippi statute, which was modeled after section 2–610 of the Uniform Commercial Code, provides in relevant part:

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach [Section 2–703 or Section 2–711] [§§ 75–2–703 or 75–2–711], even though he has notified the repudiating party that he would await the latter's performance and has urged retraction ....

the contract price ..." under Miss.Code Ann. § 75–2–713(1). In this case, the plaintiff chose to cover; therefore, damages must be measured by the "difference between the cost of cover and the contract price ...." Miss.Code Ann. § 75–2–712(2).

Uncontradicted evidence at trial established that plaintiff's agent, Cox, paid $8.34½ per bushel for 20,000 bushels of soybeans on December 8, and $7.84 per bushel for the remainder purchased on December 9. The defendants, therefore, were entitled to recover the difference between the price paid by Cox and the contract price. Consequently, the district court's entry of a judgment for the plaintiff for $23,821.60, which included $21,656.00 as the difference between the cost of cover and the contract price, plus interest, was proper.

It is not necessary for us to address plaintiff's cross-appeal or defendants' challenge to the jury instruction since we find the district court was correct in granting a judgment notwithstanding the verdict in favor of the plaintiff on its claim and a directed verdict in favor of the plaintiff on the defendants' counterclaim. Consequently, the judgment of the district court is affirmed.

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, dissenting.

I cannot agree that there was no factual dispute concerning the December 8, 1980 telephone conversation between Smith and Cox. Nor can I agree that, if we accept the defendants' version of that conversation, its "gist" is the same. There was a factual dispute concerning the conversation, it was material and its resolution was an issue for the jury. For these reasons, I respectfully dissent from the majority's conclusion that the district judge properly granted plaintiff a judgment notwithstanding the verdict.

The case turns on when defendants breached the contract. The majority concludes that this happened during the December 8th conversation because Smith then positively and unconditionally repudiated the contract.

Smith, however, testified that he did not repudiate the contract in that conversation. Although he testified that he stated their delivery would be short, he also testified that he agreed with plaintiff to meet several days later to settle the contract. He considered the conversation merely a prelude. Although he did make damaging admissions on cross-examination, the jury was entitled to credit the account of the conversation he gave on direct examination.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc), requires that we consider both the evidence and all reasonable inferences that may be drawn from it in the manner most favorable to the party with whom the jury agreed, and forbids us, as the majority does, to adopt the version most favorable to the party whom the fact finder did not credit. In the appendix, I set forth excerpts from Smith's testimony that seem to me sufficient to sustain the jury's verdict.

### APPENDIX

The witness is Michael Smith, on direct examination. Transcript pp. 82–84.

Q. Tell us then on December 8th what happened in a relationship to your conversation with Mr. Cox and how you produced on your contract.

A. Well, I called him and told him that we'd finished cutting our beans and wanted to set up a date, you know, that we could go down and get with him and, you know, settle up our contract, at which time he told me that all of our beans hadn't come in from Gulf Grain. And at that time he said he didn't know and he would get back in touch with me when they did come in and we could get down. And he just never did. As soon as he hung up the phone he was burning it, I reckon.

Q. Pardon?

A. I said as soon as he hung up the phone he was burning it trying to sell them, I reckon.

Q. Did he ever call you and tell you that?

A. No, sir.

Q. Did he tell you on December 8th that he was going to purchase beans for Louis Dreyfus to fulfill your contract?

A. No, sir, he didn't.

Q. When is the first time that you knew that he had done that?

A. On the 12th of December.

\*   \*   \*   \*   \*   \*

Q. All right, sir. Did you authorize him to sell or purchase beans to supply your contract on December 8th?

A. No, sir.

Q. Have you at any time authorized him to purchase beans to fulfill your contract at any time?

A. No, sir.

\*   \*   \*   \*   \*   \*

On cross examination. Transcript pp. 104–106.

Q. And let me talk with you very briefly about that phone conversation on the 8th.

A. Go ahead.

Q. That was you, wasn't it, that called Mr. Cox?

A. Yes, sir.

Q. And that was early in the morning?

A. Yes, sir.

Q. At 7:45 A.M. In fact it was before the prices on the Chicago Board of Trade opened for the day?

A. Yes, sir.

Q. And you told him you'd finished cutting beans, is that correct?

A. Yes, sir.

Q. What else did you tell him?

A. We had a—we talked about the beans that were over at Gulf Grain and everything.

Q. Did you know how much was over at Gulf Grain then to be cleaned?

A. There were three loads.

Q. Three truckloads?

A. Yes, sir.

Q. So a couple of thousand bushels at most?

A. Yes, sir.

Q. Twenty-five hundred bushels at most?

A. Yes, sir.

Q. Did you discuss anything else?

A. No, sir.

Q. Do you recall stating in that phone conversation to Mr. Cox you wanted to pay up?

A. I didn't say that.

Q. You never said that?

A. No, sir.

Q. When you called did you intend to convey the message to him that you wanted to pay him?

A. I said that we would get together and settle up when they got everything in.

Q. Now you knew you were short on your deliveries?

A. Yes, sir.

Q. Very short?

A. Yes, sir.

Q. But it's your testimony now that you never said you wanted to pay up?

A. No, sir, I never did say that.

Q. Never said that? You're absolutely certain about that?

A. Yes, sir.

\*   \*   \*   \*   \*   \*

Continuing the cross examination, plaintiff's counsel questions Smith about his deposition. Transcript p. 106.

Q. Do you remember my asking you back then about that phone conversation?

A. Yes, sir.

Q. What was your answer at that time?

A. I reckon it was the same thing I said now.

Q. You didn't say then you wanted to pay up, is that correct?

A. I believe I said "settle up."

\*　　\*　　\*　　\*　　\*　　\*

The deposition is handed to Smith. Plaintiff's counsel asks some preliminary questions. Then the questioning continues. Transcript p. 107.

Q. All right. The next question I asked was: "What was your purpose in calling him?" Now this was back on the 2nd day of October, 1981, this was down in my office, and your answer at that time was the following: "I called him and was going to see if we could settle our contract. We was, you know, going to pay up. He told me he didn't have all the beans in and stuff and wait three or four days and he'd call me back." Now is it your testimony today you didn't tell him you were going to pay up?

A. Well, I must have did if that's what I said.

\*　　\*　　\*　　\*　　\*　　\*

On redirect, Transcript p. 141, Smith testified:

Q. You were asked on cross examination, particularly from Pages 20 and 21 of the deposition, about having told Mr. Cox that you would come down or either that you would come down and pay up. Tell the Jury what you meant when you said that to Mr. Cox.

A. What I meant when I said it?

Q. Yes, sir.

A. Well, he was going to call me back when all of our stuff got in from Gulf Grains, all of our beans and everything was in, and we were going to get together and either pay him or him pay us what the difference was on our contracts that we were short on.